# EXHIBIT A

Electronically Filed
7/23/2026 6:25 PM
TIMOTHY F. ANDREWS
CLERK OF THE COURT

Shreya Chaudhary, Esq.
*Pro Hac Vice forthcoming*
**MAUNE.RAICHLE.HARTLEY.FRENCH & MUDD, LLC**
1900 Powell Street, Suite 200
Emeryville, California 94608
Telephone: (510) 215-2015
Facsimile: (314) 241-4838
schaudhary@mrhfmlaw.com

Lawrence E. Mittin, Esq.
Nevada Bar No. 005428
**CRAIG P. KENNY & ASSOCIATES**
501 S. 8th Street
Las Vegas, NV 89101
Telephone: (702) 380-2800
Facsimile: (7002) 380-2833
lmittin@cpklaw.com
*Attorneys for Plaintiffs*

CASE NO: A-26-952137-C
Department 18

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| DAVID J. FEENEY, Individually and as Successor-in-Interest to CHRISTINE E. FEENEY, deceased; JOHN FEENEY,<br><br>Plaintiffs,<br><br>vs.<br><br>BLOCK DRUG COMPANY, INC.; SAFEWAY INC.; WALMART INC.; DOES 1-100, inclusive;<br><br>Defendants. | CASE NO.:<br><br>DEPT. NO.:<br><br>**ARBITRATION EXEMPTION CLAIMED**<br><br>**IN EXCESS OF $100,000**<br><br>**COMPLAINT FOR WRONGFUL DEATH, SURVIVAL AND PUNITIVE DAMAGES AND DEMAND FOR JURY TRIAL – ASBESTOS** |

**<u>JURISDICTION AND VENUE</u>**

1. Plaintiffs David J. Feeney and John Feeney are the husband and son respectively, of Decedent Christine E. Feeney. Decedent Christine E. Feeney was a resident of Las Vegas, Clark County, Nevada. Plaintiff David J. Feeney hereby sues individually as the husband and wrongful death heir of his wife, Christine E. Feeney, deceased, and as the Successor-in-Interest to Chrstine E. Feeney. Plaintiff John Feeney hereby sues for damages as the son and wrongful death heir of decedent Christine E. Feeney.

2. Defendant Block Drug Company, Inc. is a New Jersey corporation headquartered in New Jersey and doing business in Clark County, State of Nevada.

3. Defendant Safeway Inc. is a Delaware corporation headquartered in California and doing business in Clark County, State of Nevada.

4. Defendant Walmart Inc. is a Delaware corporation headquartered in Arkansas and doing business in Clark County, State of Nevada.

5. The Defendants have submitted to the jurisdiction in Nevada and have waived the statute of limitation as they filed a forum non conveniens motion before the Superior Court of the State Court of California to move the case no. 22CV016064 (David J. Feeney et. al. vs. Barretts Minerals Inc. et al.) from the Superior Court of California, County of Alameda to the State of Nevada. The California Superior Court granted said motion on March 27, 2026. The order dated March 27, 2026, granting the motion issued by the Superior Court of California is attached as **Exhibit A**.

6. Jurisdiction over the parties and the subject matter herein is proper with this Court pursuant to the Nevada Constitution and the Nevada long-arm statute, NRS 14.065.

7. Venue is proper in this Court pursuant NRS 13.040 because the causes of action alleged herein originated in Clark County.

## COMPLAINT

## GENERAL ALLEGATIONS

8. Plaintiffs incorporate paragraphs 1 through 7 of this Complaint as though fully set forth herein.

9. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOE 1 through 100, inclusive, are unknown to Plaintiffs; therefore, Plaintiffs sue those defendants by these fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege, that each defendant designated as a DOE defendant is responsible, negligently or in some other actionable manner, for the events and

happenings hereinafter referred to and thereby directly and proximately caused injuries and damages to Decedent as alleged in this complaint.

10. Pursuant to NRS Section 41.141.5, each of the defendants is jointly and severally responsible and liable for the acts and/or omissions of co-defendants.

11. At all times herein mentioned, each of the named defendants and DOE defendants, was the successor, successor in business, successor in product line or a portion thereof, parent, subsidiary, wholly or partially owned, or the whole or partial owner of or member in an entity engaged in the business of researching, studying, mining and/or milling, manufacturing, distributing, delivering, supplying, selling, marketing, labeling, re-labeling, retailing, specifying, recommending, using, installing, and/or removing asbestos and/or asbestos-containing materials and products. Said entities shall hereinafter collectively be called "alternate entities". Each of the defendants are liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or whole or partially owned entity or entity that it was a member of or funded, that researched, studied, mined and/or milled, manufactured, distributed, delivered, supplied, sold, marketed, labeled, re-labeled, retailed, specified, recommended, used, installed, and/or removed asbestos and/or asbestos-containing materials and products. Each of the following defendants is liable for the acts of each and every "alternate entity" in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity; each defendant has acquired the assets, product line, or a portion thereof, of each such alternate entity; each defendant has the ability to assume the risk-spreading role of each such alternate entity; and that each defendant enjoys the goodwill originally attached to each such alternate entity.

12. Decedent Christine E. Feeney ("Decedent" or "Mrs. Feeney") routinely used cosmetic talcum powder products manufactured, marketed, sold, and supplied by Defendants from the time she was a teenager throughout her adult life, including in the state of Nevada. Decedent's use of these talcum powder products created airborne dust. Plaintiffs allege that the talc used in the manufacture of the talcum powder products that Mrs. Feeney used was contaminated with asbestos and that Mrs. Feeney was exposed to asbestos as a result.

13. Additionally, Decedent's husband, David Feeney, routinely used cosmetic talcum powder products manufactured, marketed, sold, and supplied by Defendants from the time he was a teenager throughout his adult life, including in the state of Nevada. David Feeney used these products in the presence of his wife or in the bedrooms and bathrooms shared by Decedent and her husband which Decedent cleaned and vacuumed. David Feeney's use of these talcum powder products created airborne dust. Plaintiffs allege that the talc used in the manufacture of the talcum powder products that Mr. Feeney used was contaminated with asbestos and that Mrs. Feeney was exposed to asbestos as a result.

14. Decedent Christine E. Feeney was exposed to asbestos and/or asbestos-containing products, which had been mined, manufactured, produced, supplied, distributed, used, and/or placed into the stream of commerce by defendants and/or the alternate entities and/or was exposed to asbestos through the use of products manufactured by defendants and/or the alternate entities. As a direct and proximate result of this exposure, Decedent Christine E. Feeney developed mesothelioma.

15. Decedent Mrs. Feeney suffered from an asbestos-related cancer, mesothelioma. Decedent first became aware of the symptoms from said disease on or about March 29, 2022 in Las Vegas, and subsequently became aware that the same was wrongfully caused.

## **FIRST CAUSE OF ACTION**

**(Negligence)**

16. Plaintiffs incorporate paragraphs 1 through 15 of this complaint as though fully set forth herein.

17. At all times herein relevant, defendants and/or the alternate entities had a duty to exercise reasonable care and caution for the safety of Decedent and others working with and around the asbestos-containing products of defendants and/or the alternate entities.

18. Defendants and/or the alternate entities knew or should have known that the asbestos fibers contained in their products had a toxic, poisonous, and highly deleterious effect

upon the health of persons inhaling, breathing, or otherwise being exposed to them. Moreover, defendants and/or the alternate entities knew or should have known asbestos is a carcinogen.

19. Defendants and/or the alternate entities failed to exercise reasonable care for the safety of Decedent by including asbestos in their products when defendants and/or the alternate entities knew or should have known that said asbestos fibers were carcinogenic, toxic, poisonous, and could have highly deleterious effect upon the health of persons inhaling, breathing, and/or otherwise being exposed to them.

20. Defendants and/or the alternate entities failed to provide any or adequate warnings to persons working with and around the products of the dangers of being exposed to the asbestos fibers contained in them and how to avoid carrying the asbestos fibers on their person, hair and clothing into the family home and vehicles.

21. Defendants and/or the alternate entities failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid being exposed to the asbestos fibers in them and how to avoid carrying the asbestos fibers on their person, hair and clothing into the family home and vehicles.

22. Defendants and/or the alternate entities failed to exercise reasonable care for the safety of Decedent by failing to conduct tests on the asbestos-containing products designed, manufactured, sold, distributed, delivered, processed, specified, applied, and/or installed by defendants and/or the alternate entities to determine the hazards to which workers such as Decedent and those she came into contact with might be exposed as a result of working with the products.

23. Defendants and/or the alternate entities failed to exercise reasonable care for the safety of Decedent when they designed, manufactured, sold, distributed, delivered, processed, specified, applied, and/or installed equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of asbestos-containing replacement components.

24. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent suffered permanent injuries to her person and death and the mental and emotional distress attendant thereto all to her and Plaintiffs' general damages.

25. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount being unknown to Plaintiffs at this time, but Plaintiffs pray leave to amend this complaint when the true and exact cost is ascertained.

26. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are still unknown; therefore, Plaintiffs will request leave to amend this complaint to conform to proof at the time of trial.

27. Defendants' and/or the alternate entities' conduct, as described herein, was intended by defendants and/or the alternate entities to cause injury to Decedent or was carried on by these defendants and/or the alternate entities with such conscious disregard for the safety and health of persons such as Decedent who were exposed to asbestos as to be willful, malicious, oppressive, fraudulent and outrageous under NRS Section 42.005, thereby entitling Plaintiffs to punitive damages against defendants, each of them.

## SECOND CAUSE OF ACTION

**(Strict Liability)**

28. Plaintiffs incorporate paragraphs 1 through 27 of this complaint as though fully set forth herein.

29. Defendants' and/or the alternate entities' asbestos and asbestos-containing products were defective and unsafe for their intended purpose which rendered them unreasonably dangerous since the inhalation of asbestos fibers causes serious disease and/or death.

30. Persons exposed to the asbestos fibers in defendants' and/or their alternate entities' asbestos and/or asbestos-containing products did not know of the substantial danger of using said products. The dangers were not readily recognizable by exposed persons. Defendants and/or the alternate entities failed to adequately warn of the risks to which Decedent and others similarly situated were exposed.

31. The defect existed in the said products at the time they left the possession of the defendants and/or the alternate entities.

32. Said defective products caused personal injury to Decedent in that Decedent suffered from and ultimately passed away as a result of her mesothelioma, an incurable cancer caused only by exposure to asbestos.

33. Defendants and/or the alternate entities, and each of them, researched, studied, mined and/or milled, manufactured, distributed, delivered, supplied, sold, marketed, labeled, re-labeled, retailed, specified, recommended, used, installed, and/or removed asbestos and/or asbestos-containing materials and products with conscious disregard for the safety of exposed persons who came into contact with said asbestos and/or asbestos-containing product.

34. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent suffered permanent injuries and death and the mental and emotional distress attendant thereto all to her and Plaintiffs' general damage.

35. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount being unknown to Plaintiffs at this time, but Plaintiffs pray leave to amend this complaint when the true and exact cost is ascertained.

36. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are still unknown; therefore, Plaintiffs will request leave to amend this complaint to conform to proof at the time of trial.

37. Defendants' and/or the alternate entities' conduct, as described herein, was intended by defendants and/or the alternate entities to cause injury to Decedent or was carried on by these defendants and/or the alternate entities with such conscious disregard for the safety and health of persons such as Decedent who were exposed to asbestos as to be willful, malicious, oppressive, fraudulent and outrageous under NRS Section 42.005, thereby entitling Plaintiffs to punitive damages against defendants, each of them.

## THIRD CAUSE OF ACTION

**(Civil Conspiracy)**

38. Plaintiffs incorporate paragraphs 1 through 37 of this complaint as though fully set forth herein, except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Count or elsewhere.

39. Defendants and/or the alternate entities, individually, together and/or as a group, have possessed since 1929 medical and scientific data which indicated that asbestos-containing insulation and other materials were hazardous to health. Prompted by pecuniary motives, Defendants and/or the alternate entities, formed a conspiracy agreement to unlawfully harm persons exposed to asbestos, including Decedent.

40. In furtherance of this conspiracy agreement, defendants and/or the alternate entities, individually, together, and/or as a group, willfully and wantonly ignored and/or failed to act upon said medical and scientific data. Rather, they conspired together to deceive and commit fraud upon the public in several aspects: by controlling industry-supported research in a manner inconsistent with the health and safety interest of users and consumers; by successfully tainting reports of medical and scientific data appearing in industry and medical literature; by suppressing the dissemination of certain medical and scientific information relating to the harmful effects of exposure to said products; and by prohibiting the publication of certain scientific and medical articles.

41. Such conspiratorial activities deprived the users, mechanics, laborers, and installers of defendants' and/or the alternate entities' asbestos and/or asbestos-containing

products of the opportunity to determine whether they would expose themselves to the unreasonably dangerous asbestos products of said Defendants and/or the alternate entities. As a direct and proximate result of the aforesaid actions, Decedent was exposed as alleged and contracted the disease set forth herein.

42. All Defendants are liable for fraudulent concealment, fraudulent misrepresentation, and conspiracy to defraud. A conspiracy to defraud involves an agreement, a wrongful act by any of the conspirators pursuant to the agreement, and damages.

43. Here, the Defendants are liable for fraudulent concealment, fraudulent misrepresentation, and conspiracy to defraud (under theories of both concealment and misrepresentation), including because the Defendants, their “alternate entities”, and each of them suppressed from all consumers and users, including Plaintiff, medical and scientific information concerning the health hazards associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.

44. Although the Defendants, and each of them knew of the substantial risks associated with exposure to asbestos, they willfully and knowingly concealed such information of the Defendants’ Products from workers, users, handlers, bystanders, and household members in conscious disregard of then rights, safety and welfare of “exposed persons”, including Plaintiff.

45. The Defendants, their “alternate entities”, and each of them, belonged to, participated in, and financially supported industry organizations including, but not limited to, the Cosmetic Toiletry and Fragrance Association (“CTFA”) (now Personal Care Products Council). The CTFA was a national association in the United States representing designers, manufacturers, and sellers of cosmetic products and ingredients — including talc powder. The CTFA’s members were responsible for approximately 85 percent of the cosmetic products distributed in the United States. For talc-related matters, the CTFA organized and acted through its Talc Subcommittee. The members of the Talc Subcommittee included the Defendants, and several other corporations that were responsible for other cosmetic talc products.

46. With respect to Plaintiffs and decedent — who bought and used the final cosmetic talc products of the Defendants — the conspirators included the Defendants, and the other corporations that participated in the CTFA and its Talc Subcommittee. The conspirators' joint motive was to protect the profitable market for their asbestos-containing talc powder, rather than to protect the safety of Plaintiff and other consumers. The conspirators together agreed to fraudulently conceal and misrepresent the asbestos-related hazards of their own, as well as each other's, cosmetic talc products. Each of the conspirators then committed such fraud against Plaintiff and other consumers, as well as against governmental entities (including the FDA and the National Toxicology Program) that, in an effort to protect the safety of consumers, periodically investigated the asbestos content of the conspirators' cosmetic talc products. As a result of that successful conspiracy to defraud consumers and governmental entities, Plaintiff for many years was exposed to asbestos from the Defendants' and the other conspirators' cosmetic talc products, which then caused Plaintiff to develop mesothelioma.

47. The following documents illustrate how the Defendants and the other conspirators formed and executed their conspiracy to defraud from the early 1960's through present day:

a. The FDA's July 8, 1971 memorandum discussed "Contamination of Talc with Asbestos." The FDA wanted to know the best technologies to test for the "identity, quantitation, and particle size distribution of any asbestos that may be present in talc." Some options included light microscopy, electron microscopy, and x-ray diffraction scanning. The FDA planned to consult with independent scientists, including from Mt. Sinai School of Medicine, as well as with WCD and other talc-industry members.

b. Avon's December 10, 1971 memorandum regarding "Asbestos and Talc" included a summary of the FDA's public meeting that had occurred on August 3, 1971. The FDA believed that "most talcum powders of major manufacturers are relatively free of asbestos. Nevertheless, on behalf of consumers, FDA is working on the details of a laboratory procedure for the analysis of asbestos in talcum powders which will give consistent meaningful results." The FDA believed that accurate results would require "use of a battery of specialized instruments and techniques, including x-ray diffraction, polarizing optical microscopy, electron microscopy, and electron diffraction of selected particles." Without such a methodology, the FDA believed that the agency was not "in a position to determine if such products on the market contain asbestos fibers." The Consumers Union expressed its hope that "existing knowledge on the subject of asbestos and talc would be resolved in the interest of the consumer rather than in the interest of the producer." And the CTFA reported (falsely) that the "Association was ready to join with FDA and the academic community to determine if there is a consumer safety problem with talc."

c. Avon's March 28, 1972 memorandum regarding "Asbestos and Talc — FDA Position" discussed that the CTFA had recommended to the FDA the use of x-ray diffraction scanning at a "1% sensitivity level for asbestos in talc." The FDA initially would hire Dr. Lewin of New York University as a consultant to test approximately 100 cosmetic talc products (including Avon's) using that method.

d. The FDA's July 20, 1972 memorandum discussed background information on "Asbestos in Talc." "A number of sources have reported the presence of asbestos fibers in talc. This asbestos is generally present as a natural contaminant in talc deposits. The amount varies within deposits and among different geographical areas. There are talc deposits which are essentially free of asbestos fibers." The FDA understood that various techniques can help to determine if asbestos is present in talc. For example, x-ray diffraction scanning can help to determine mineral percentages, but cannot "give any idea of the number [or] size of fibers present." And optical microscopy can detect fibers, but cannot always identify their type.

e. Dr. Lewin's August 3, 1972 report to the FDA showed that 43 of the 102 tested cosmetic talc products contained detectable levels of asbestos minerals by x-ray diffraction scanning. Avon's two products (Sample Nos. 62 and 101) each contained tremolite; and many other products contained tremolite and/or chrysotile.

f. The FDA's August 11, 1972 memorandum summarized the FDA's meeting with the CTFA regarding Dr. Lewin's test results. Avon and other companies, along with Dr. Lewin, also attended the meeting. The FDA explained that Dr. Lewin's findings would become public as the FDA considered whether to enact regulations regarding asbestos in cosmetic talc products. But the CTFA **"strongly objected to the possibility that FDA would make the analytical results public in such a way as to give brand names and manufacturers.** [CTFA] indicated that such a disclosure of randomly selected samples in the market place would result in a great economic hardship for the companies involved and their employees." [Emphasis added.] CTFA threatened **"to take legal action to prevent public disclosure."** [Emphasis added.] And instead of enacting any regulations, the CTFA urged the FDA to accept "voluntary industry compliance" with industry's own testing standards. Regarding the hazards of any asbestos in talc, "[t]here was no disagreement between FDA and industry scientists present at this meeting about the potential safety hazard that the presence of asbestos in talc containing cosmetic product poses to the consumer."

g. The CTFA's December 21, 1973 memorandum summarized the CTFA's private December 7, 1973 Talc Subcommittee meeting. Avon and other companies attended the meeting. They discussed their recent round robin testing for asbestos in talc samples using the "Proposed FDA Method" of optical microscopy. The method detected chrysotile asbestos, but inconsistently. "Modification" of the method could make it more dependable. "It was agreed to urge FDA to defer finalizing the proposed optical microscopic method until it can be altered to be more reliable, or even replaced if necessary."

h. The CTFA's December 10, 1973 internal report likewise summarized the CTFA's findings from its round robin testing. The FDA's proposed **optical microscopy** method "may be used with some modification" such as "better selection of R.I. [refractive index] liquids and reduction of sample size per slide." By contrast, **x-ray diffraction scanning** methods normally had a best-case detection limit of <u>one percent by weight</u> of tremolite asbestos minerals in a talc sample; it could not "distinguish fibrous from nonfibrous" particles; and it could not reliably detect chrysotile asbestos minerals because of "chlorite interference." The CTFA concluded that **transmission electron microscopy "appears to offer the best, most reliable method and is probably capable of detecting chrysotile and tremolite (fibrous), both at a level**

**of 0.1%."** [Emphasis added.] But instead of recommending TEM, the CTFA would ask the FDA for a "postponement of the finalization of the proposed regulation on talc," to allow time for a "a collaborative effort between FDA & industry to resolve a satisfactory method of estimating chrysotile and tremolite in talc."

i. Two weeks later, the CTFA's December 26, 1973 letter to the FDA stated that it was "premature for FDA to impose its proposed optical method," and the CTFA (falsely) pledged to "assist" the FDA in "method development research."

j. The CTFA's February 19, 1974 memorandum summarized the CTFA's private meeting of its Task Force on Methodology for the Detection of Asbestos in Talc. Avon and other companies attended the meeting. They discussed that with **transmission electron microscopy**, chrysotile asbestos **"is estimated easily at 0.1% by weight**," and that "**at 0.1% chrysotile the fibers are readily apparent in every exposure and can be readily estimated in a matter of minutes.**" [Emphasis added.] "**The method is suitable in situations where a great number of different talc specimens are to be studied.**" [Emphasis added.]

k. The CTFA's August 19, 1974 memorandum summarized the CTFA's private meeting of its subcommittee on Asbestos in Talc. Avon and other companies attended the meeting. They discussed their latest round robin testing, which detected chrysotile and tremolite asbestos minerals in talc samples. Additionally, the CTFA knew that the FDA was now "leaning heavily toward" x-ray diffraction scanning, and was "about ready to abandon their original proposed optical microscope technique." As for x-ray diffraction scanning, "**Once again, the limit to be suggested to FDA is 1%, with which we can live**" — the CTFA could live with that because tremolite asbestos normally was present in cosmetic talc products at levels below one percent, and because the method could not reliably detect chrysotile asbestos. [Emphasis added.]

l. The CTFA's December 4, 1974 memorandum summarized the CTFA's private meeting of its Talc Subcommittee. Avon and other companies attended the meeting. They discussed that the CTFA would recommend to the FDA the use of x-ray diffraction scanning with its one-percent detection limit for tremolite asbestos minerals, with optical microscopy serving only as a "back-up" to doublecheck only positive results. The CTFA would not recommend transmission electron microcopy because, although "**theoretically [it] is satisfactory," a "disadvantage[]" was that its "ultra sensitivity could be a problem**" — i.e., the CTFA disfavored transmission electron microscopy <u>because</u> it detected asbestos in cosmetic talc products <u>too</u> effectively. [Bolded emphasis added.]

m. A December 17, 1974 J&J memorandum discussed that the CTFA's talc task force had decided what test methods would be recommended to the FDA for "determining the presence of chrysotile and tremolite in talc. **We believe it is critical for the C.T.F.A. to now recommend these methods to the F.D.A. before the art advances to more sophisticated techniques with higher levels of sensitization**." [Emphasis added.]

n. The next month, the FDA's January 7, 1975 memorandum discussed the FDA's meeting with the CTFA on the "Status of Regulation(s) Regarding Asbestos in Talc." Industry first argued that chrysotile asbestos should not be the subject of any testing of talc, and <u>misstated</u> that "regulation was unnecessary because evidence indicates that chrysotile does not occur in talc." Industry further <u>misstated</u> that it was "sure there was no chrysotile present in cosmetic grade talc," and again <u>misstated</u> that "they could not find talc which contained chrysotile." Next, industry <u>misstated</u> that "analysis for amphibole (tremolite) minerals by x-ray diffraction was a reliable method with a sensitivity of 0.5%," and so the industry would determine tremolite

content by that method. Moreover, the industry argued that "self-regulation" should be permitted instead of enacting any actual regulations.

o. Likewise, a February 13, 1975 J&J memorandum discussed a meeting among the CTFA and FDA that had occurred on February 7, 1975. Industry again misstated that chrysotile asbestos did not exist in cosmetic talc products. Plus, the industry again requested that the FDA allow "selfregulatory action" as to any testing for asbestos in talc.

p. Similarly, the CTFA (via Bristol-Myers) sent a September 17, 1975 letter to the FDA, and again misstated that chrysotile asbestos did not exist in cosmetic talc products; and that the companies purportedly made a "sincere and continuous effort to regulate our industry so that it will provide good and safe products to its customers."

q. Next, the CTFA's September 23, 1975 letter to the FDA provided a copy of the industry's proposed test method for asbestos in talc. It relied upon x-ray diffraction scanning for amphiboles only (not chrysotile), with a stated detection limit of 0.5 percent. And only if a positive result occurred by x-ray diffraction scanning, then optical microscopy was used as a back-up method. Transmission electron microscopy was not included, and the CTFA concealed the fact that it disfavored that method because of its "ultra sensitivity" for detecting tremolite and chrysotile asbestos in talc. The CTFA instead misstated that transmission electron microscopy was just too impractical.

r. The FDA's February 27, 1976 memorandum discussed the FDA's meeting with a reporter from the Washington Post regarding the "current status of our efforts with regard to the regulation of asbestos in cosmetic talc products." The FDA had been persuaded (by the CTFA's concealment and misrepresentations) that x-ray diffraction scanning for tremolite was "suitable for routine quality control of talc," and that transmission electron microscopy was "not a suitable method for routine evaluation of talc because of the time-consuming methodology." Additionally, the FDA had abandoned its proposed regulation for optical microscopy because the FDA had been persuaded (again, by the CTFA's concealment and misrepresentations) that the method was "unsatisfactory for the aforementioned reasons." The FDA had no further "regulatory plans."

s. Similarly, a March 11, 1976 newspaper report, "Talc Tests Wanting, FDA Experts Admit," was published in the Record in Bergen County, New Jersey. The FDA official stated that (because of the CTFA's concealment and misrepresentations) the FDA trusted the cosmetic talc industry's assurances that it was "concerned about the asbestos content of their product." Plus, the FDA was not equipped to challenge the industry because "the FDA lacks the legal authority, the man power, and the money to adequately protect the public [from] potentially hazardous cosmetics." 'Every cosmetic that goes on the market should be test[ed] . The law today merely prevents manufacturers from introducing adulterated or misbranded products.' The entire cosmetics budget, is only 2-1/2 million, and we have only 8 chemists. There are 250,000 different cosmetic products on the market and 4000-5000 manufacturers. We have 1% of the total FDA budget.' ... 'We cannot test every sample."

t. At the same time, the CTFA's March 11, 1976 memorandum summarized a meeting of its Talc Task Force. Avon and other companies attended the meeting. They discussed that each company should provide to the FDA asbestos testing data as to their recent cosmetic talc products. The CTFA would gather letters from each company and then submit them to the FDA at an upcoming meeting on March 15, 1976.

u. The CTFA and its members then indeed wrote and submitted letters to the FDA on March 15, 1976— purporting to "demonstrate responsibility of industry in monitoring its talcs. We are certain that the summary will give you assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." Each company misrepresented that their cosmetic talc products were adequately tested and free of asbestos; and each company concealed that their products in fact were not adequately tested and that they contained traces of asbestos. Avon's March 12, 1976 letter to the FDA misstated that Avon's identified negative test results by x-ray diffraction scanning reliably showed that Avon's cosmetic talc products were free of tremolite and chrysotile asbestos. Avon concealed its positive asbestos test results that were achieved by x-ray diffraction scanning and by other methods.

v. The FDA's March 15, 1976 memorandum discussed the meeting that had occurred with the CTFA. Avon and other companies attended the meeting. Industry reiterated that it would test for asbestos by x-ray diffraction scanning, with a detection limit of .5 percent at best for amphiboles. Industry stated that it would not test for asbestos by transmission electron microscopy, misstating that the method was not suitable because of its complexity and cost, and concealing that the method was not suitable to them because it detected tremolite and chrysotile asbestos too well. The FDA requested that the "industry voluntarily report the results of any sampling program to the FDA on a regular basis."

w. The FDA's March 18, 1976 memorandum discussed that "though the submission by the CTFA Talc Subcommittee looks impressive at first hand, it does not offer much assurance that cosmetic talcs are adequately tested for asbestos. If this is all that can be expected from the cosmetic industry in the form of analytical effort in the light of the asbestos in talc publicity since 1971, we have not much choice but to move ahead as speedily as possible with a proposal of a regulation on asbestos in talc ..." On March 19, 1976, FDA scientists asked the FDA Acting Director whether they may "prepare such a proposed regulation." But such approval was never granted.

x. Meanwhile, the CTFA's March 31, 1976 memorandum summarized a meeting of the Talc Subcommittee. Avon and other companies attended the meeting. They "agreed on the success of the presentation of summary reports given to the FDA," and industry would "not obligate itself to give periodic reports to FDA." In the future, if the "time is right," industry might present more information to the FDA. Industry would not further address the FDA's request for voluntary sampling and reporting.

y. Separately, on September 21, 1976, Avon wrote to the OSHA Compliance Office, which had asked about the "talcs we use at Avon." Avon misstated that since 1973 it had maintained adequate testing programs to "assure that the talcs we were using were asbestos-free."

z. On October 7, 1976, the CTFA officially adopted its "J4-1" testing method for amphibole asbestos in talc. It relied upon x-ray diffraction scanning, with a .5 percent detection limit for amphibole asbestos only (not chrysotile asbestos). Optical microscopy was used as a back-up method only if a sample tested positive by x-ray diffraction scanning.

aa. The CTFA's October 18, 1976 memorandum discussed the next "Round- Robin Test on Talc Samples." Dr. Langer of Mt. Sinai would purchase bottles of talc, and then create sub-samples to be tested by different labs.

bb. On December 23, 1976, the CTFA (via J&J) sent "coded samples" of talc to each of the round robin testing participants, including Avon. The samples were to be tested

for "asbestiform amphibole minerals" pursuant to the CTFA's J4-1 test method for x-ray diffraction scanning.

cc. J&J's April 21, 1977 letter to the round robin participants reported that three samples had failed the test — meaning that amphibole asbestos minerals were present at levels above 0.5 percent. "**The sample code, which is still in my possession, has been released to <u>no one</u>**." [Bolded emphasis added.] J&J called for a meeting to discuss "special training for the analysts and repeating the round robin."

dd. The CTFA's June 13, 1977 memorandum summarized the May 17, 1977 meeting where the CTFA discussed the results to-date of the round robin testing. Avon and other companies attended the meeting. Their objective was to **'Test and verify CTFA Method J4-1 for this purpose - assurance that method is <u>accurate</u>, <u>reliable</u> and <u>practical</u>.'... these objectives have <u>not yet</u> been achieved.**" [Bolded emphasis added.] The CTFA therefore planned a round robin partial retest.

ee. J&J's March 1, 1978 letter to the CTFA enclosed the "table which breaks the code for the recently completed CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals." Each participant would learn the results for "their product <u>only</u>." After the retest, no product was reported to contain "asbestiform" amphibole above 0.5 percent — any amphibole above that level was reported as "<u>non</u>asbestiform." J&J would "**destroy the only other copy of this table**," and the CTFA must "**Destroy your copy of the table**." [Emphasis added.]

ff. The next month, the FDA's April 25, 1978 memorandum discussed "Asbestos in foods and cosmetics." The FDA remained "interested in having a method developed so that fractions of 1% of asbestos can be tested in foods or cosmetics." The FDA still believed the industry's misstatements that the optical microscopy method was "not a practical one." The FDA therefore did not pursue any regulations.

gg. Several years later, on November 8, 1983, a citizen petitioned the FDA to require cosmetic talc products to be labeled with an asbestos warning statement, information on asbestos particle size, and the proportion of talc impurities in the product.

hh. But in 1986, the FDA denied that petition because the FDA still trusted the industry's prior misstatements. The FDA noted it was "aware that some cosmetic talc produced in the 1960s and early 1970s did contain asbestiform minerals. However, your petition has not persuaded us that the cosmetic talc that is presently being produced contains significant amounts of asbestiform minerals." Without requesting any updated data from industry, and without performing any testing of its own, the FDA assumed that cosmetic talc products were pure.

ii. Several more years later, the CTFA's October 19, 1993 memorandum discussed industry responses to questions that would be raised at the upcoming symposium hosted by the FDA and the International Society of Regulatory Toxicology and Pharmacology. Avon and other companies were included in the discussion — and an August 5, 1993 receipt shows that Avon contributed $2,000 for the project. As to how the industry "assure[s] talc is free of asbestos," the industry planned to <u>misstate</u> that "the conditions under which talc forms are dissimilar to the geologic conditions under which asbestos forms"; that the industry uses test methods that "provide adequate sensitivity <u>and</u> specificity"; and that "Cosmetic grade talc doesn't contain tremolite."

jj. Similarly, the CTFA's January 7, 1994 draft presentation/manuscript for that FDA/ISRTP symposium included additional industry misstatements. Avon and other companies received the draft. The industry planned to <u>misstate</u> that "talc deposits of

commercial significance are rarely associated geologically with asbestos"; and that based on "rigorous quality assurance requirements, the likelihood of consumer exposure to asbestos in cosmetic grade talc is virtually nonexistent."

kk. After the symposium, a June 7, 1994 follow-up letter written by an FDA official who attended the symposium, addressed to the CTFA, shows that the CTFA indeed communicated its planned misstatements: "In your presentation at the Symposium, I thought I heard you say that talc and asbestos materials were not formed under the same geological conditions therefore the careful selection of mining sites results in asbestos-free talc. In a paper by Rohl, A.N., et al. (J. Toxicol. Environ. Health (1976) 2, 255-284) the authors said 'They [asbestos materials and talc] form in the same as well as similar geological processes. Consequently, many talc deposits contain asbestos minerals, so that in industrial and commercial use, such talcs always contain varying amounts of asbestos fibers.' **Which is true?**" Emphasis added.]

ll. Several years later, in 2002 (the final year that Avon made and sold cosmetic talc products) the CTFA made similar misstatements to the National Toxicology Program. In the CTFA's March 18, 2002 letter and attachment, the CTFA misstated, "In 1976, CTFA promulgated a specification for cosmetic talc to ensure that it is free of asbestos. As a practical matter, that specification is self-enforcing. Asbestos has been listed as a known human carcinogen, is highly regulated, and no consumer products company would knowingly run the risk of asbestos being present in its product, even in minute quantities. ... CTFA promulgated its specification for cosmetic talc in 1976, which required a complete absence of detectable asbestos in cosmetic talc."

48. The Defendants and the other conspirators thus successfully avoided — through their fraudulent concealment and misrepresentations against consumers and governmental entities from the 1970's through 2000's — any meaningful public awareness or effective response to the talc/asbestos problem. As the FDA's website explains, the FDA still lacks legal authority to require adequate talc/asbestos testing by the industry, or to require disclosure of private industry data: "Under the Federal Food, Drug and Cosmetic Act (FD&C Act), cosmetic products and ingredients, with the exception of color additives, do not have to undergo FDA review or approval before they go on the market. Cosmetics must be properly labeled, and they must be safe for use by consumers under labeled or customary conditions of use. The law does not require cosmetic companies to share safety information with FDA."

49. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent suffered permanent injuries and death and the mental and emotional distress attendant thereto all to her and Plaintiffs' general damage.

50. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred liability for physicians, surgeons, nurses, hospital care,

medicine, hospices, x-rays and other medical treatment, the true and exact amount being unknown to Plaintiffs at this time, but Plaintiffs pray leave to amend this complaint when the true and exact cost is ascertained.

51. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are still unknown; therefore, Plaintiffs will request leave to amend this complaint to conform to proof at the time of trial.

52. Defendants' and/or the alternate entities' conduct, as described herein, was intended by defendants and/or the alternate entities to cause injury to Decedent or was carried on by these defendants and/or the alternate entities with such conscious disregard for the safety and health of persons such as Decedent who were exposed to asbestos as to be willful, malicious, oppressive, fraudulent and outrageous under NRS Section 42.005, thereby entitling Plaintiffs to punitive damages.

## FOURTH CAUSE OF ACTION

**(False Representation Under Restatement of Torts Section 402-B)**

53. Plaintiffs incorporate paragraphs 1 through 52 of this complaint as though fully set forth herein, except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Count or elsewhere.

54. At all times relevant, defendants and/or the alternate entities, individually, together, and/or as a group, expressly and impliedly represented to members of the general public, including the purchasers and users of defendants' and/or the alternate entities' asbestos and/or asbestos-containing products and other individuals exposed to thereto, including Decedent, that said asbestos and/or asbestos-containing products were of merchantable quality and safe for the use for which they were intended.

55. The purchasers and users of said asbestos and/or asbestos-containing products, and other individuals exposed thereto, including Decedent, relied upon said representations of

defendants and/or the alternate entities, individually, together, and/or as a group, in the selection, purchase and use of asbestos and/or asbestos-containing products.

56. Said representations of defendants and/or the alternate entities, individually, together, and/or as a group, were false, and defendants and/or the alternate entities knew at the time that they were false, in that asbestos and/or asbestos-containing products were not safe for their intended use, nor were they of merchantable quality as represented by defendants and/or the alternate entities because said asbestos and asbestos-containing products have dangerous properties and defects that cause asbestosis, other lung damage, and cancer to the users and others exposed to the asbestos, thereby threatening the health and life of said persons, including Decedent.

57. As a direct and proximate result of the above-mentioned false representations by defendants and/or the alternate entities, individually, together, and/or as a group, Decedent sustained the injuries and damages alleged herein.

58. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent suffered permanent injuries and death and the mental and emotional distress attendant thereto all to her and Plaintiffs' general damage.

59. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount being unknown to Plaintiffs at this time, but Plaintiffs pray leave to amend this complaint when the true and exact cost is ascertained.

60. As a direct and proximate result of the aforesaid conduct of defendants and/or the alternate entities, Decedent has incurred loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are still unknown; therefore, Plaintiffs will request leave to amend this complaint to conform to proof at the time of trial.

61. Defendants' and/or the alternate entities' conduct, as described herein, was intended by defendants and/or the alternate entities to cause injury to Decedent or was carried on

by these defendants and/or the alternate entities with such conscious disregard for the safety and health of persons such as Decedent who were exposed to asbestos as to be willful, malicious, oppressive, fraudulent and outrageous under NRS Section 42.005, thereby entitling Plaintiffs to punitive damages.

## FIFTH CAUSE OF ACTION

**(Wrongful Death/Survival Action)**

62. Plaintiffs incorporate paragraphs 1 through 61 of this complaint as though fully set forth herein, except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Count or elsewhere.

63. Each of the Defendants had a duty to exercise a reasonable degree of care, caution, diligence, and foresight.

64. Defendants breach such duties and thereby committed negligence causing serious injuries ultimately resulting in the death of Decedent.

65. As a direct and proximate result of the aforementioned breach, Decedent suffered severe physical and mental pain and suffering prior to her death.

66. David J. Feeney, Individually and as Successor-in-Interest to Christine E. Feeney, deceased, and John Feeney, individually, hereby state a cause of action pursuant to N.R.S. 41.085 and N.R.S. 41.100 and request all the damages attended thereto, and allowed by law.

67. The acts of Defendants, and each of them, were extreme and outrageous and caused Plaintiffs' severe emotional distress which is all to Plaintiffs' damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000).

WHEREFORE, Plaintiffs pray judgment against Defendants as follows:

68. Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

69. As a direct and proximate result of Defendants' conduct as set forth above, Plaintiffs seek damages including the following:

a) All personal injury damages available under Nevada law, including without limitation pecuniary losses and pain and suffering;

b) Punitive damages;

c) Pre-judgment interest and post-judgment interest and costs of suit; and,

d) For such other and further relief as this Court deems just and proper.

WHEREFORE, Plaintiffs pray for judgment against Defendants and their "alternate entities" for their damages, punitive damages, pre-judgment and post-judgment interest at the legal rate, for their costs, and for such other relief to which Plaintiffs may be entitled.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**JURY DEMAND**

70. Plaintiffs hereby demand trial by jury.

DATED: July 22, 2026

MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC

By: */s/ Shreya Chaudhary*

Shreya Chaudhary
*Pro Hac Vice forthcoming*
1900 Powell Street, Suite 200
Emeryville, CA 94608
Telephone: (510) 255-2015
Email: schaudhary@mrhfmlaw.com

CRAIG P. KENNY & ASSOCIATES

By: ______________________

Lawrence E. Mittin, Esq.
Nevada Bar No. 005428
501 S. 8th Street
Las Vegas, NV 89101
Telephone: (702) 380-2800
Email: lmittin@cpklaw.com

Attorneys for Plaintiffs